728 P.2d 1 (1986)
In re ADOPTION OF A.G.K.
WILLIAM CURTIS K. and Katherine Grace K., Appellees,
v.
REBECCA RHYNE K., Appellant.
No. 64006.
Court of Appeals of Oklahoma, Tulsa Division.
October 21, 1986.
Randall Elliott, Pryor, for appellees.
Gary J. Dean, Pryor, for appellant.
Released for Publication by Order of the Court of Appeals of Oklahoma, Tulsa Division.
*2 BRIGHTMIRE, Presiding Judge.
She was loved by two mothers  a happy little girl whose ties with her natural mother were suddenly severed by the trial judge.
The crucial question is whether he should have. More specifically, it is whether the evidence supports the court's finding that the divorced natural mother of A.G.K., a minor, should be deprived of her parental rights because of having failed to contribute to her daughter's support, as ordered by the court, for a period of twelve months immediately preceding the filing of a petition for adoption of A.G.K. by her natural father  the custodial parent  and his current spouse.
Based on such finding the trial court concluded that the child was eligible for adoption without the consent of her natural mother, and that the mother has "no further standing to participate in or contest any further portion of the adoption proceedings."
The natural mother challenges both the findings and conclusions of the trial court. We reverse.

I
To William (Bill) and Rebecca (Becky) K. was born A.G.K. (Amy), on May 2, 1976. The parties divorced in Mayes County in 1978 and custody of Amy was vested in the father.
The father remarried in 1981. The mother, who following the divorce developed a drinking problem, did not. She worked in several different places doing various things  most recently as a stockbroker in Houston, Dallas and Tulsa.
The father never asked Becky for any child support until the fall of 1983. When the father did tell her he would like to have a court order for her to pay some, she readily agreed to one and on October 27, 1983, the court, at the request of the father, entered an order modifying the divorce decree and calling for the mother to pay the father $200 a month for the support of Amy, beginning January 1, 1984. The mother made no payments during 1984. In January 1985 the father and his new spouse, Katherine (Kathy), filed this action seeking a decree allowing the latter to adopt 8-year-old Amy. At the same time they applied to the court for an order allowing the adoption to proceed without the consent of the natural mother, which they said the court was authorized to do by 10 O.S. 1981 § 60.6(3)(a)[1] since the mother *3 had "willfully" failed to substantially comply with the child support order during the preceding twelve months.
This application to strip the natural mother of her parental rights was heard on February 19 and 21, 1985, following which the trial judge found the natural mother had willfully failed to pay the court-ordered support and held that by law her consent to her daughter's adoption was not required. He reasoned as follows:
"In my view there eare [sic] two ways that the respondent can walk around that statute.
"First, one would be to demonstaraate [sic] that the Petitioner in some way mislead [sic] her, and I'm using that word in it's broadest possible sense, [i]nto not making the child support payments. In examining that question what is the relationship between divorced parties who share a common child. Obviously their relationship is not the fiduciary relationship that they enjoyed while the marriage continued. A divorce case like any other action at common [law?] is an advisary [sic] proceeding. I assume that advisary [sic] proceeding does not cease to exist when the divorce decree is finalized and signed. I conclude Mr. Dean speculated upon what the Petitioners motive [sic] were, I suspicion [sic] Mr. Dean will disagre [sic] with what I'm about to say. I conclude that what his altertive [sic] motives were is irreleant [sic]. As long as what he said or did to the Respondent did not amount on one end fraud [sic], certainly discourgement [sic] of the payment of child support. There is no evidence that such an event occured [sic].
The other matter for considerations in attempting to circumvent that 60.6 would be to show that the actions on the part of the Respondent were not willfull [sic] within the meaning of the statutes.
As I believe both counsel have intamated [sic] the law does not require that someone in the Respondent's position pay the sum of $200.00 per month, every month like clockwork. Indeed as I require sometimes. And as [an] aside I must confess that I find myself somewhat in the position of the Judge cited in the Brief by the Petitioners' counsel, which was a very good brief. Which is simply to admit that I'm a product of my own time and age. That perhaps I do not expect the same standard out of females that I do out of males, and I suppose my daughters would both say that that makes me a male chauvinist. Be that as it may. The, [sic] again I do not know and I think it is a harsh rule of the law, but it is a necessary one, whether you are dealig [sic] in civil law or criminal law. [sic] That ignorance of the law is not an excuse. The respondent did make a conscious choice though it was not conscious in the sense that she said, I'm not going to pay child support, it was conscious in the sense that she elected to take what funds were available to her and expend them on something else. Legally that is a conscious and willfull [sic] act. In summation the court finds neither defense has [been] sustained [and] the Petitioner is within the perimeters of the statute. The adoption may go forward without the consent of the Respondent." (Emphasis ours.)
The mother appeals contending that (1) the evidence was insufficient to support a finding of a willful noncompliance with the agreed court order within the contemplation of § 60.6; (2) petitioners should be estopped from adopting without the natural mother's consent because they induced the mother to delay support payments; and (3) it was error to hold the mother had no standing to participate in the adoption proceedings *4 or question the propriety of the proposed adoption.

II
We think there are several serious questions which emerge from the record and the relevant law. One involves the meaning and legal effect of § 60.6(3); another relates to the exclusion of evidence offered by the mother; a third is whether the evidence clearly and convincingly shows a willful violation of the court order within the contemplation of § 60.6(3)(a); a fourth is whether the father waived his right to the subject support payments; and a fifth is whether the trial court may exercise discretion to protect a child's interest even if grounds exist to sever parental rights under § 60.6.[2]
The mother admits she made no support payments during the relevant twelve-month period but contends the failure was not willful in a § 60.6 sense, but was due in part to a lack of funds and in part to the request of the father. She points to evidence that following entrance of the 1983 support order she (1) experienced a substantial (65 percent) reduction in income which continued throughout 1984; (2) was hospitalized during 1984 for one month; (3) was induced by the natural father to defer any support payment in order to lay the groundwork for a contemplated adoption proceeding; (4) resided in Houston and Dallas for nine of the twelve months in question during which time the father thought it was better for the child that the mother spend money traveling (mostly on commercial aircraft) between her home in Texas and Pryor, Oklahoma, to be with the child than to pay the support money to him; (5) was led to believe that the $200 support order she agreed to was not necessary for the support of her child but was to accumulate in the form of a savings account for the child's future needs and education; (6) offered to make support contributions during the twelve-month period but as mentioned in (3) was induced by the father to defer any payments until later; and (7) made a payment in the thirteenth month following the rendition of the support order and tendered continuing and past support, all of which was refused by the husband.
Based on the trial judge's pre-decisional remarks it appears he considered himself bound to conclude that the mother's consent to adoption of her child was not necessary if he found her conduct satisfied one or more of the grounds set out in § 60.6. And, of course, this is the way the statute seems to read. The problem is, however, that such a construction of the statute requires the court to ignore the effect on the child's welfare of abrogating the mother's right to withhold consent to an adoption  an effect which equates with severance of the parental tie because in reality judicial extinguishment of such right is tantamount to terminating the parental rights of such parent. For obviously if a parent cannot block a contemplated adoption, she cannot prevent her parental rights from being destroyed by the adoption.[3]
On its face, as we indicated, the statute does not expressly vest in the trial court discretion to withhold § 60.6 relief if necessary for the advancement of the child's best interests  the protection of which both the legislature and the courts have generally considered important, indeed essential. In this respect, for instance, the adoption statute is in conflict with another Title 10 "Children" statute, § 1130, which deals specifically with the termination of parental rights. This statute vests discretion in the court to decline termination by providing that it "may" terminate a parent's rights if it finds the existence of grounds substantially the same as those in § 60.6. It is clear such discretion is granted to avoid a termination *5 that the court finds to be contrary to the best interests of the child  the protection of which is the primary purpose for and paramount objective of all the children-oriented provisions of Title 10. In re Adoption of Graves, 481 P.2d 136 (Okl. 1971). Consistent with this is the high court's commitment to a strict construction of our adoption statutes in favor of preserving natural parental rights where the controversy is between a natural parent and persons seeking to destroy that status. Adoption of Robin, 571 P.2d 850 (Okl. 1977). Robin, incidentally, has further relevance in that the court invoked principles of equity to prevent the perpetrator of deception from reaping the benefit of an unfairly gained advantage, saying that it is not important how fraud is accomplished but whether the deceit, scheme, plan or design is founded on facts and circumstances that are inimical to basic tenets of fairness and equity. Certainly § 60.6 should receive a construction which will promote harmony between it and § 1130 and at the same time satisfy the underlying intent, purpose and policy objective of both statutes, as well as the rest of Title 10. To this end we hold that the trial court has inherent discretion under both statutes to grant or withhold the relief requested as the relevant equities and the best interests of the child may require.

III
The first question to resolve here, then, is whether under the evidence the court was justified in terminating the mother's parental rights even if it could be said that she willfully failed to pay child support for twelve months. We hold it was not.
The undisputed evidence is that the woman admirably set out to earn a living for herself and at the same time maintain a close and affectionate relationship with her daughter. At the time of the divorce the mother worked "in real estate." Following the divorce she left Pryor and set out to seek her fortune in a metropolitan area. She worked for awhile in Tulsa, then later in Oklahoma City as a sales trainee for Nabisco. And although she earned about $18,000 that year (1978), she still had to file a bankruptcy petition. Later she again worked in Tulsa but after the father remarried in 1981 she moved to Dallas and took a position with Merrill Lynch stock brokerage firm. Later she worked awhile in Houston then back in Dallas and at the time of trial was with a stock brokerage firm in Tulsa.
In 1979 she earned about $15,000, in 1980 around $30,000, in 1981 approximately $24,000, in 1982 some $28,000, and in 1984 only about $10,000  a drop she attributed to a sharp decline in brokerage commissions and to her prolonged hospitalization for treatment of her alcohol problems.
During all of this time she made frequent trips to Pryor to visit her daughter and on occasion kept her for two weeks at a time. To maintain this relationship it was of course necessary for her to spend a good deal of money on travel. The mother estimated that between the time of the divorce and the father's remarriage in August 1981 she visited her daughter about sixty-nine weekends. Following the marriage she flew up from Texas as often as she could afford to, usually once a month.
The evidence demonstrates she cared a great deal about her child and in her limited circumstances appears to have done what she could to promote and advance the child's moral development and mental well being.
The other thing the appealing mother deserves a good deal of credit for is the positive attitude she maintained toward the warm relationship established between the stepmother and the child  an unusual phenomenon among those involved in child custody-related or domestic relations contests. The women got along well. It appears that little Amy had the good fortune to be unselfishly loved by two women, each of whom even seemed to encourage affection between the "other mother" and the child. *6 One witness described the relationship between the natural mother and her child as "very close," and added, "[T]hey are both very loving with each other, they sometimes argue with each other, they have a good time." During her testimony the natural mother referred to the stepmother as "Amy's mother." When asked about this she said she did so because her daughter does, she has no objection to it, and has referred to Kathy, the stepmother, as "mother" in the child's presence and considers the youngster as having "two mothers." The stepmother testified she had "had a good relationship with Becky [the natural mother]" and that there had never been "any disagreements, harsh words, misunderstandings or anything of that nature... ."
For some reason the court sustained an objection to Kathy testifying whether she felt "it would be in Amy's [the child] best interest if Becky had no visitation rights with her daughter." In this regard the court said, "I allow the parties to answer that question [regarding the best interest of the child] but nobody else. It is the ultimate question." When reminded that the witness was a party to the lawsuit, the judge's puzzling response was, "Well of course she's a party I suppose in a technical sense, but in a sense that she has no custody or control over the child at this time"!
This ruling, unfortunately, overlooked the stepmother's own self-serving testimony concerning her immediate and long range goals affecting Amy's welfare. She said she married Amy's father intending to "assume the responsibility of not only a wife to him, but raising his daughter since he had custody and I intended for it to be as if she were my own" and went on to say she did not want the relationship interrupted if something happened to the father "after the amount of time that he and I spent developing" the family relationship of the four people  father, stepmother, her young son by a previous marriage, and Amy.
The foregoing corroborates Becky's testimony that the father broached the subject of Kathy adopting Amy early in December 1984. "He said," Becky recalled, "that in the case of his death he did not [want] me to come in and jerk Amy away from her mother and out of the Pryor school and away from her home... . I stated at the time that I agreed [with] him that I would not come in and jerk Amy away from her mother ... but that I did want my visitation rights, and that I was willing to discuss the matter with him." The father said he could not trust Becky on the matter and the only way he knew to assure Kathy got what she wanted was for Kathy to adopt Amy. He then told Becky not to make any support payments until "our attorneys [have] talked." She didn't. The next thing she heard about the matter was a question put to her by a process server: "Are you Rebecca K.?"
This evidence makes it clear that for whatever reason, the stepmother decided quite sometime before December 1984 that she wanted to adopt Amy. A stratagem was developed which evidently involved the need for a child support order against Becky as a preliminary predicate for the potential invocation of the provisions of § 60.6. The trouble with the plan was and is that it appears to have been stimulated by an injudicious objective of the stepmother to preserve a familial triumvirate  consisting of Kathy, her own son and Amy  beyond the life of the father. In the first place the test is not what's best for the stepmother, but what's best for the little girl. We see nothing in the record to justify a finding that it is in the best interest of Amy to be shorn of the bonds that bind her to her natural mother. And in the second place the validity of the stated purpose is vulnerable to close examination. No one can foresee, for instance, with any degree of certainty what the future holds for Kathy's coveted relationship whether the father perishes or not. Nothing in this life is certain but change itself. It would appear to be neither fair nor proper for a court of *7 justice to take the drastic and irrevocable step of severing ties created by nature, preserved by law, and strengthened by years of affection merely to accommodate the current wishes of a stepparent no matter how well intended. The letter of the law must occasionally be interpreted in terms of its spirit, especially where it clearly is being used in a manner and for a purpose never intended by its creators. Indeed, to carry Kathy's futuristic concerns a step further, one might well speculate on the consequence of a common disaster overtaking her and the natural father following the adoption sought. Would not little Amy be left without any legal parent, natural or otherwise?
We decline to approve the change of a known satisfactory legal status in order to achieve one of which no man can be certain.
Finally, there is another legal reason why subject order must be vacated  failure of the trial judge to concern himself with the child's interest in having her natural parental bonds preserved. Such relational rights of the child are not addressed in § 60.6. And to the extent the statute authorizes abrogation of a substantial parental right affecting the child  particularly where the annulment has the ultimate effect of a complete termination as here  without consideration of or regard for the child's fundamental liberty interest in its continuation, the statute is constitutionally infirm. It offends the child's state and federal constitutional due process rights  both procedural and substantive[4]  and deprives her of other rights guaranteed by the fifth, fourteenth and ninth amendments, including equal protection of the laws.[5] When the state authorizes destruction of familial bonds it must provide both parent and child with fundamentally fair procedures which, among other things, require that petitioners allege and prove by at least clear and convincing evidence that the extinguishment of the natural parent-child relationship is in the best interest of the child.[6]
For the foregoing reasons we hold the order is void as to the child.

IV
Next we come to the question of whether the evidence was sufficient to find Becky's noncompliance with the agreed order willful within the meaning and intent of § 60.6.
We hold it is not.
There is no question the support order in question was spawned by the stepmother's desire to become the exclusive mother of Amy in fact as well as in name. Adoption of the child by Kathy was thought to be the only way to reach that goal. One thing stood in the way, though, and that was the consent of Becky. Since they could not get it otherwise, the father set out to lay a predicate for evading it. He asked Becky for something he had not theretofore asked for  child support. She agreed to an order and the rest we already know. While the father denies he ever asked Becky not to pay child support after the order was signed, the circumstances tend to indicate otherwise and corroborate Becky's testimony. Moreover, though the father was permitted to deny that he ever discussed with Becky the fact that it would be in the best interest of Amy for her natural mother to spend her limited resources on travel expenses for personal mother-daughter visits than to make the support payments, the mother's testimony to the contrary, incredibly, was excluded and became the subject of a rejected offer of proof.
*8 What happened was this: Becky testified that she and the father agreed that the child support payments should not begin until January 1984 because her brokerage commissions had fallen off and she was expecting some after the first of the year. At the same time there was discussion, Becky said, regarding her financial situation and the visitation expenses resulting from her living in Texas. An objection to the subject of "visitation expenses" was made and sustained on the ground the subject had no bearing on the issue of "willfulness." Whereupon Becky's counsel made the following offer of proof:
"Mr. Dean; Comes now the respondent your honor, and makes the following Offer of Proof. That if she were permitted to respond to the question, her answer would be, that she and Bill [K.] discussed the matter of her financial ability and varying income by reason of being a commission type employee. They discuss [sic] as between the parties a priority as to whether the mother maintaining visitation contact with the child, Amy, was as important or more important than paying the monthly child support payment and by agreement of both of the parties it was agreed that the mother living in Texas maintaining contact and visitation rights with her daughter was in the daughter's best interest and those occasions and months she would be financially unable to contribute $200.00 child support, that she should expend such funds as necessary to continue her visitation rights, and your honor that concludes the Offer of Proof.
Court; All right sir.
Mr. Dean; In reference there to [sic] on argument we believe that this helps establish a state of mind, intention of the Respondent, based upon conversations with Mr. Bill [K.] and would demonstrate that any failure to contribute child support under the order, and under the circumstances set forth would not be a wilfull [sic] violation of the court's order.
Court; Ask your next question."
Rejection of this evidence was error. In the first place the father had already opened the door rather widely. And in the second place the evidence was relevant to the issue of willfulness. The father, to whom the support money was to be paid, could certainly have waived such court-ordered payment. Kissinger v. Kissinger, 692 P.2d 71 (Okl.Ct.App. 1984). And if he waived payment by leading the lady to believe that for Amy's sake he wanted her to spend the support money for visitation travel expenses between Dallas and Pryor, he cannot expect to come into a court of equity and have it take seriously a charge that the woman willfully failed to comply with the court order. If nothing else, the court could find that the father in effect authorized the use of support money due him for the mother's visitation travel expenses and therefore there was a substantial compliance with the court order. The high court of this state has not looked with favor on creative predicates contrived by one natural parent or his allies to generate a statutory ground for terminating the other's parental rights. In re Adoption of Gregory, 495 P.2d 1275 (Okl. 1972). In Gregory, the mother of a child wanted his stepfather to adopt. During the year preceeding the filing of the adoption petition the mother refused to accept the natural father's offer to make court-ordered support payments. Then later, to circumvent the need for obtaining the father's consent in an adoption proceeding, the mother alleged the father had willfully failed to pay child support for twelve months. The trial court agreed and allowed the adoption to proceed without the father's consent. In reversing this order the court said that while the father appears to have failed or neglected to contribute the required support money, it could not be found that he did so "willfully" for twelve months within the meaning of § 60.6.[7] Said the court, *9 "[W]e do not believe that the Legislature intended to enact a provision which would allow petitioners to induce respondent to forego making child support payments and then utilize his failure to make the payments to deprive him of his son."
In the case at bar the rejected evidence offered by the natural mother at trial, when considered along with other facts and circumstances proved, tips the scales of justice in favor of a finding that the mother did not willfully violate the child support order the father induced her to agree to for the benefit of the stepmother. Certain it is that the evidence is not clear and convincing that she did.

V
The order appealed is vacated and the subject application is denied.
REIF, J., concurs.
MEANS, J., concurs in result.
NOTES
[1] The actual text of § 60.6(3)(a) which was in effect until February 1, 1986, reads in pertinent part:

"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of its mother, if living, except that consent is not necessary from a father or mother:
... .
3. Who, for a period of twelve (12) months next preceding the filing of a petition for adoption of a child, has willfully failed, refused or neglected to contribute to the support of such child:
a. in substantial compliance with a support provision contained in a decree of divorce, or a decree or separate maintenance or an order adjudicating responsibility to support in a reciprocal enforcement of support proceeding, paternity action, juvenile proceeding, guardianship, or orders of modification subsequent thereto, or other lawful orders of support entered by a court of competent jurisdiction adjudicating the duty, amount, and manner of support,
... .
and where any of the above conditions exist it shall not be necessary to terminate parental rights under Section 1130 of this title prior to the adoption of said child. Provided that any decree of adoption heretofore entered by any court of appropriate jurisdiction within the State of Oklahoma wherein termination of parental rights, as prescribed in Section 1130 of this title, was not obtained shall not be invalid on the ground that such termination of parental rights was not obtained."
[2] The supreme court has held that the effect of a final decree of adoption is to terminate natural parental rights, but it has not passed on the legal consequence of the conflict of substantive rights we are concerned with here. See Wade v. Brown, 516 P.2d 526 (Okl. 1973).
[3] Id.
[4] U.S. Const. amend. V, IX and XIV, § 1; Okla. Const. art. 2, § 7.
[5] See Matter of T.M.H., 613 P.2d 468 (Okl. 1980), requiring the appointment of independent counsel; see also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), a case involving the rights of a parent but which logically applies equally to a child; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
[6] Santosky v. Kramer. Id.
[7] The same provision is now found in § 60.6(3).