# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>A.O.-A.<br><br>                         Appellant. | No. 56647-8-II<br><br>UNPUBLISHED OPINION |

PRICE, J. — A.O.-A. appeals the superior court's order committing him to 180 days of involuntary treatment at Western State Hospital (WSH). A.O.-A. argues that the superior court's finding that he is gravely disabled is not supported by substantial evidence. We affirm the superior court's order.

## FACTS

In October 2020, the State filed a petition for 180 days of involuntary treatment because criminal charges against A.O.-A. had recently been dismissed due to incompetence to stand trial. The State also alleged that A.O.-A. was gravely disabled. The trial court entered an order committing A.O.-A. to WSH for 180 days' commitment based on both alleged grounds.

Near the end of that 180-day commitment period, the State filed another petition for 180 days' commitment. A hearing began on December 9, 2021, and was continued to January 6, 2022, due to technical difficulties. A.O.-A. attended the hearing via Zoom on December 9; however, on January 6, A.O.-A. refused to leave his room to attend the court hearing. Multiple attempts were

made to explain the hearing to him and encourage him to attend, including ensuring he could speak with his lawyer and an interpreter. Despite this, A.O.-A. insisted that "it was not his court" and would not attend. Verbatim Rep. of Proc. (VRP) at 53. The superior court found that A.O.-A. voluntarily waived his right to be present at the hearing.

Dr. Michael Stanfill was retained as an expert for A.O.-A. Dr. Stanfill reviewed the entire history of A.O.-A.'s case. Based on the records, A.O.-A. was arrested on child molestation charges in 2008. A.O.-A. was in custody until his trial in 2010. However, just prior to trial, competency concerns were raised. Ultimately, he was determined to be competent and was found guilty. Prior to sentencing, competency concerns were raised again and the trial court determined that A.O.-A. was not competent to stand trial. Thus, his convictions were vacated.

Multiple evaluations were performed through 2012, resulting in conflicting opinions regarding competency. A.O.-A. remained in custody from 2012 to 2019. The status of the case or the reason for the extensive delay were not clear. Evaluations were performed in 2019 and 2020. In 2020, the trial court determined that A.O.-A. was incompetent and not restorable, prompting civil commitment proceedings.

Dr. Stanfill explained that, prior to 2020, all competency concerns revolved around borderline intellectual functioning, not psychosis. In early 2020, evaluations began identifying psychotic components. And at present, "all evaluators could agree, since early 2020, that his beliefs are rigid and perseverative and are not based in reality." VRP at 58. Dr. Stanfill agreed with A.O.-A.'s prior diagnosis of unspecified schizophrenia spectrum. And although Dr. Stanfill agreed that A.O.-A.'s paranoia about the legal system, the hospital, and locked facilities was based

2

on some amount of reality, the perseveration and focus on the belief suggested a paranoid delusional belief.

Dr. Stanfill did not believe that there was any indication that A.O.-A. was unable to meet his basic needs. None of A.O.-A.'s records demonstrated that specific prompting or treatment plans were necessary for eating or showering. Further, A.O.-A. may be described as irritable, agitated, or disengaged, but he did not exhibit physical aggression. Dr. Stanfill opined that A.O.-A. was not gravely disabled.

Dr. Stanfill was not able to complete a clinical interview with A.O.-A. because he became agitated and was not able to be redirected. Dr. Stanfill testified:

> I could see—he was on video, and he kept telling me, "I don't have court. I don't have an attorney. I just need to go home," things that he's said across other forms of contacts. I could see staff kind of lining up at the door, and I didn't want there to be a forced move or incident, so I—I eventually just said, "Why don't we stop it?"

VRP at 68.

Dr. Kelly Price, a licensed clinical psychologist at WSH, testified that she was the ward psychologist who had been working with A.O.-A. since August 2021. Dr. Price diagnosed A.O.-A. with unspecified schizophrenia spectrum with a psychotic disorder based on evidence of thought disorganization and perseveration. A.O.-A. exhibited pervasive beliefs about a conspiracy underlying his prolonged detention and commitment, as well as his relationship with spirits and a creator. Dr. Price explained:

> More specifically, he has repeatedly reported to me beliefs around a conspiracy around his detention and commitment, both in jail and in [the] hospital. For example, he's talked about people wanting to play games with him and deliberately making it so he doesn't have a relationship with a woman in the future.

3

> He's also talked a lot about spirits and his connection with the creator. For example, he's talked about how his connection with the creator means that he knows that God is displeased with the system and with the hospital and with the legal system and how the creator, for example, will send tornadoes or hurricanes or possess other professionals in the hospital with demons.

VRP at 9. On cross-examination, Dr. Price admitted that A.O.-A.'s belief systems were likely grounded in the reality of his experiences. For example, believing in spirits may be a common cultural or religious belief. Further, A.O.-A. did spend more than 10 years incarcerated on criminal charges with no resolution. However, Dr. Price's concern came from how his beliefs affected his decision-making and emotional regulation.

Dr. Price testified that these pervasive beliefs interfered with A.O.-A.'s ability to engage in meaningful conversations about discharge, treatment, or support. They also caused him to become agitated and difficult to redirect. Dr. Price did not believe A.O.-A. was able to regulate his emotions when triggered, due to the frequency and intensity of his reactions.

A.O.-A. also exhibited extremely limited insight into his condition, only insisting that he was "not crazy." VRP at 10. Although Dr. Price had attempted to discuss discharge planning with him, he only provided vague answers and refused to provide information necessary to determine if his discharge plans were realistic. For example, A.O.-A. stated he wanted to live with one of his siblings, but he refused to sign releases that would allow WSH to contact his siblings and explore the possibility.

Dr. Price also explained that A.O.-A. had been confined in an institution of some kind since at least 2010, which provided a highly structured environment for meeting basic needs. Although A.O.-A. met his basic needs at WSH, he was prompted to engage in these activities. A.O.-A. also participated in WSH's token economy.

Although medication had been prescribed, A.O.-A. refused to take any medication, so the prescription was stopped. Dr. Price also testified that A.O.-A. refused to engage or participate in any treatment or discharge planning. Based on A.O.-A.'s behavior, Dr. Price did not believe that he would seek out or follow through with any mental health care in the community. Dr. Price explained that while A.O.-A. appeared to meet his basic needs within a highly structured environment with a lot of prompting, she believed some oversight and support would be required for him to continue to meet those needs.

Dr. Price opined that A.O.-A. was gravely disabled. When asked how A.O.-A.'s behavioral health disorder manifested in a severe deterioration of routine functioning due to a repeated and escalating loss of cognitive functioning, Dr. Price explained:

> The—the cognitive control, I think, is what I testified to last time. His frequent intrusion of beliefs manifests itself greatly in discussions that he has with many of us, myself included. And he's extremely difficult to redirect. So the volitional aspect, to my mind, is around his cognitive control than necessarily his behavioral control, but I would also posit that potentially the environment that he's in is managing the potential risk of any behavioral instability currently because we are not able to test him outside in a less structured setting because he will not participate in discussions around accessing the quad area, for example, without staff, and that would give us confidence that he would be able to manage with less support.

VRP at 78-79.

Dr. Price also noted that since the last hearing, A.O.-A. had refused to meet with the financial worker to discuss benefits and financial aid he could be entitled to in the community. A.O.-A. also continued to refuse any consent for WSH to contact his family members to discuss discharge. Although getting A.O.-A. out of the hospital would be challenging without his participation, Dr. Price was hopeful that if the superior court found that a less restrictive alternative

was in A.O.-A.'s best interests, it would provide incentive for him to begin engaging in discharge planning.

In its oral ruling, the superior court stated:

The crux of this case is Prong B [of the definition of gravely disabled] for this Court. It is, I think, both parties' experts, whom this Court both respects greatly, agree that he is gravely—that he has a behavioral health disorder, and that it has manifested itself in repeated and significant delusional beliefs, paranoid thinking which affect or influence his cognitive control; his thought disorganization concerning his current placement, the history, his belief system in that a higher power or God is sending things to either punish the Earth or possess the doctors in attempting to control him or disrupt the hospital's operations, affect his cognitive functioning and his ability to control his volitional control is—is affected by that belief system.

I think the agitation and paranoia that he is experiencing—the paranoia kind of causes that agitation. He has some inability to regulate his emotions as a result of these conspiracies or belief system and why he's in the situation that he's in, and I—I believe that there has been a severe deterioration in his routine function and that it has been shown by repeated and significant loss of cognitive control.

The big question for this Court is whether or not it's essential that he receive care within an involuntary treatment setting. Both doctors agreed that he would benefit from a structured environment; that he would benefit from mental health treatment, but I guess the question is whether it's essential that he receive that treatment in an involuntary setting.

He clearly will not seek treatment on his own. He stated as much. And I think that the belief system that he has, and that interference in his cognitive functioning, clearly affect his ability to set a plan or execute a plan, and I think that—that would affect his ability to stay healthy and safe in the community. It's this Court's opinion that involuntary treatment is essential to him addressing those issues of his mental health and his safety in the community.

I believe that if he were to be released today without any support system or guidance, that harmful consequences could befall him, either contact with law enforcement or being homeless or—or failing to provide for his shelter and food.

. . . .

I absolutely think that a less restrictive placement is in his best interest, a highly structured environment that can assist him in meeting those needs, of addressing his mental health concerns, the psychosis that both doctors have noted, and that he will participate. He's not making rational decisions. He's shown an inability to accept information that is essentially in his best interest, and as a result, this Court finds that he is gravely disabled under Prong B of the statute.

6

VRP at 94-96. The superior court entered a written order finding that A.O.-A. was gravely disabled and, "as a result of a behavioral health disorder manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [was] not receiving such care as [was] essential for health and safety." Clerk's Papers at 50. The superior court also found that a less restrictive alternative was in A.O.-A.'s best interest. The superior court ordered 180 days' commitment for involuntary treatment.

A.O.-A. appeals.

ANALYSIS

A.O.-A. argues that the superior court's grave disability finding is not supported by substantial evidence.[1] We disagree.

We review challenges to the sufficiency of the evidence in a light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019). "When the standard is 'clear, cogent, and convincing . . . the findings must be supported by substantial evidence in light of the highly probable test.' " *Id*. at 85 (alteration in original) (internal quotation marks omitted) (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d

---

[1] A.O.-A. also argues that the superior court's written findings are insufficient to allow meaningful appellate review. MPR 3.4(b) requires the superior court to enter written findings of fact and conclusions of law. Where written findings are required, the written findings must be "sufficiently specific to permit meaningful review." *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). Even inadequate written findings may be supplemented by the superior court's oral ruling. *Id*. at 219. Further, when there has been no objection to the findings below, courts will give the findings liberal construction rather than reverse the superior court. *Id*. at 219. Here, the superior court's written findings, which also incorporated the superior court's oral ruling, are sufficient to allow for meaningful appellate review. Accordingly, we reject A.O.-A.'s argument that the superior court's order should be reversed because its written findings are inadequate.

138 (1986)). We will not disturb the superior court's findings if those findings are "supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209.

Generally, a person may be "involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled." *Id*. at 202. The State has "[t]he burden of proving that a person is gravely disabled and in need of treatment . . . [and] the standard of proof is clear, cogent and convincing evidence." *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992); RCW 71.05.310.

There are two alternative definitions of "gravely disabled," both of which provide a basis for involuntary commitment. *LaBelle*, 107 Wn.2d at 202. A gravely disabled person is one who

> as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(24). The superior court found that A.O.-A. was gravely disabled under only prong (b).

Proving grave disability under RCW 71.05.020(24)(b) includes two requirements: the State must show that an individual manifests severe mental deterioration in routine functioning and the individual is not receiving essential care for his or her health and safety. *LaBelle*, 107 Wn.2d at 205. Evidence proving prong (b)

> must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or

her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id*. at 208. Further, the individual must be unable to make rational decisions regarding his or her treatment. *Id*. at 208. The purpose of commitment under prong (b) is to prevent a revolving door of mental health care by "permitting intervention before a mentally ill person's condition reaches crisis proportions" and enabling "the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." *Id*. at 206.

Here, A.O.-A. argues there was not substantial evidence of deterioration in routine functioning because his condition has remained stable and there was no evidence of what his state of routine functioning was. However, deterioration in routine functioning can be shown by repeated and escalating loss of cognitive or volitional control. *Id*. at 208. The record contains multiple examples of A.O.-A.'s loss of cognitive control. For example, A.O.-A. was unable to meet with his retained expert for even a few minutes before his agitation escalated to the point that Dr. Stanfill felt it was necessary to terminate the contact. A.O.-A. was also unable to participate in even simple discussions to further his own goal of discharge, such as being able to spend time in the outdoor quad area of WSH, consenting to contacting family members he wants to live with, or meeting with a financial worker. This repeated loss of cognitive control is substantial evidence supporting the superior court's finding that A.O.-A.'s behavioral health disorder manifests severe mental deterioration in routine functioning.

A.O.-A. also argues that there was insufficient evidence to prove that he is not receiving essential care because there was no evidence that the highly structured environment of WSH was

necessary for him to meet his basic needs and because the State had established only mere uncertainty as to his discharge plans. However, the superior court's findings were not based only on lack of information, but rather, affirmative evidence of A.O.-A.'s inability to make rational decisions. A.O.-A. wants to be discharged, and WSH supports a less restrictive environment and was putting in effort to transition A.O.-A. out of the hospital. However, A.O.-A. refused to engage in any conversation or planning that would further his discharge.

Regardless of why, A.O.-A. has not lived in the community for over 10 years. He has not coordinated housing, provided for his financial needs, or been responsible for his mental or physical health care since he was incarcerated in 2008. A.O.-A.'s inability to even discuss gaining access to the outdoor quad area or to meet with a financial worker to discuss benefits he would receive in the community is substantial evidence that A.O.-A. is unable to make rational decisions and, therefore, continued care is essential for his health and safety.

We affirm.

No. 56647-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

VELJACIC, J.